FILED
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CITY OF FORT COLLINS, a
Colorado home rule municipality,

     Plaintiff - Appellee,

v.

OPEN INTERNATIONAL, LLC, a
Florida limited liability company;
OPEN INVESTMENTS, LLC, a
Florida limited liability company,

     Defendants - Appellants.

No. 24-1152

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:21-CV-02063-CNS-SBP)**

_____

Laurie Webb Daniel (Jeffrey Keith Sandman, with her on the briefs), of Webb
Daniel Friedlander LLP, Atlanta, Georgia, and New Orleans, Louisiana, for
Defendants-Appellants.

Case L. Collard of Dorsey & Whitney LLP, Denver, Colorado (Maral J. Shoaei
and Andrea Ahn Wechter, of Dorsey & Whitney LLP, Denver, Colorado, and
Carrie Mineart Daggett, City Attorney, and John R. Duval, Senior Litigation
Counsel, of the Fort Collins City Attorney's Office, Fort Collins, Colorado,
with him on the brief), for Plaintiff-Appellee.

_____

Before **BACHARACH**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

The City of Fort Collins and Open International, LLC, contracted for software services, which ended with each party (including Open International's parent company, Open Investments, LLC) alleging breach-of-contract claims against the other.[1] But the City also alleged that Open's precontractual statements were negligent or fraudulent misrepresentations—claims sounding in tort law. Answering only the question of liability, a jury found that Open fraudulently induced the City to enter the contract. The City elected to rescind the contract, so the district court held a bench trial on restitution and ordered a judgment of almost $20 million against Open.

Open appeals the jury's verdict and the district court's denials of its motions for judgment as a matter of law. Because we find no error with the district court's rulings or the jury's verdict, we affirm.[2]

## BACKGROUND

### I.    Factual Background

In February 2018, the City published a request for proposal (RFP) for a billing software system for municipal utilities, including a new broadband utility called Connexion. On March 12, 2018, Open submitted a proposal for the project based on its forthcoming software, Open SmartFlex Version 8. Open

---

[1] Except where the distinction matters, we refer to Open International and Open Investments collectively as "Open."

[2] On February 19, 2025, Open moved for leave to file a supplemental appendix. We deny that motion.

2

claimed that its product "complie[d] with the vast majority of functional and technical requirements of th[e] RFP with one single and uniform product[.]" Supp. App. vol. 4, at 1011 (emphasis omitted).

The RFP included a functional matrix that listed all the functional requirements needed for the product and that directed bidders to complete the matrix "accurately and factually" according to the provided grading rubric. Supp. App. vol. 8, at 2143. In its RFP response, Open graded about 90% of its homegrown software's functionalities with "A's," representing that the functionality was "part of [its software's] base system" and that "[n]o [m]odification [was] required." App. vol. 2, at 3.

The City selected Open International to be its vendor. And the parties formalized their contract with a Master Professional Services Agreement, in which Open Investments guaranteed Open International's performance under the contract but made no contractual representations of its own. The contract's introduction incorporates by reference the RFP and Open's proposal, which includes the detailed functionality matrix for the services that Open International was to provide.

The project kicked off in late 2018 and suffered problems from the beginning. One of the main sources of conflict was the customer self-service portal for the City's broadband-billing services. The service went live in August 2019 and had "critical functionality missing." App. vol. 7, at 68–69. In November 2019, the City cited the portal as one of its primary concerns, stating

3

that the "portal testing hours [have been] extensive" and that the "presented portal was different than what got delivered[.]" App. vol. 9, at 26–27.

Despite these problems, the City continued its contractual relationship with Open International. Throughout the project, the parties negotiated and executed twenty-nine project change requests (PCRs), including PCR 19, which addressed issues relating to the customer portal. In a March 2020 memorandum, the City's external project manager documented her concerns over problems with Open International's product, but still recommended that the City preserve its relationship with Open International. And in June 2020, both parties agreed to a formal amendment that extended project milestones into 2021 and assigned most of the added project costs to the City. The parties again agreed to extend the project in December 2020.

Prompted by this second amendment, the City hired a third-party consultant to assess the project. In an April 2021 report, the consultant advised the City to continue the project with Open International despite the project delays and frustrations. Completing the project with Open International remained "Plan A" for the City. App. vol. 7, at 120–21. The parties jointly reviewed the functional matrix to evaluate whether the program was performing as Open had represented it would. But during the review in April and May 2021, the City determined that Open's precontractual assertions about its software's capabilities were false.

4

Also during the review, Open International sent the City a notice of default stating that it could not proceed with its work unless and until the City cured certain deficiencies. From the City's view, that default notice "was a significant breach of trust." *Id.* at 123. Then on May 28, 2021, the City served its own notices—a notice of dispute and notice of termination. In June, Open International provided a "Reset Proposal" that acknowledged the results of the functional matrix audit—which showed that only 17.3% of the "[i]n scope" requirements had been accepted—and sought additional funds to complete the project. Supp. App. vol. 9, at 2473. But the proposal would not cure the issues within the thirty days required by the contract, so the City initiated this lawsuit on July 2, 2021. The City also promptly retained a second vendor and began implementing that product, and it stopped all use of Open International's product as soon as the new platform was available in December 2021.

## II.    Procedural Background

On July 2, 2021, the City sued Open for breach of contract, negligent misrepresentation, and fraud-in-the-inducement. The City based its tort claims on misrepresentations about (1) the timing for executing the project and the level of support Open International would provide, (2) Open International's software being "ready for implementation," and (3) the fitness of Open International's software for the City's needs. App. vol. 3, at 60–61 ¶¶ 70–73. Open pleaded affirmative defenses and asserted a counterclaim for breach of contract.

During discovery, the City learned that despite Open grading almost 90% of the required functionalities as an "A" in its March 2018 RFP response, Open had internally assessed its software as meeting only 59.4% of the required functionalities. Open's internal assessment was dated in March 2018, before it responded to the RFP. Also, the City learned that Open had not graded the provided software—a third-party portal called "Milestone"—in the functionality matrix but had instead graded its "homegrown" software. *See* App. vol. 13, at 254–55.

Open moved for summary judgment on the City's tort claims, arguing that the claims were barred by the contract's merger clause and Colorado's economic-loss rule, and that the City had waived the claims by repeatedly affirming the contract. The district court denied the motion. *See City of Fort Collins v. Open Int'l, LLC*, No. 1:21-CV-02063-CNS-MEH, 2023 WL 3585214, at *1, *13 (D. Colo. May 22, 2023). Open then asked the court to require the City to elect a remedy before trial—either affirming the contract and receiving damages or rescinding the contract and receiving restitution. But the court decided that the City would not have to select a remedy until the jury returned a verdict on the tort claims. *City of Fort Collins v. Open Int'l, LLC*, No. 1:21-CV-02063-CNS-SBP, 2023 WL 11868279, at *2, *4 (D. Colo. Sept. 27, 2023). If the City elected damages, the jury would be instructed on the breach-of-contract claims and counterclaims; if the City elected rescission, the jury would

6

be dismissed, and the court would hold a bench trial on rescission and restitution.

The trial started on October 23, 2023, and lasted ten days. At the close of evidence, Open moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on the breach-of-contract claim and the tort claims. The court denied the motion. Then the court gave the jury "all of the general closing instructions," but only the fraud and negligent-misrepresentation "claim-specific instructions." App. vol. 5, at 58–59. For each of the tort claims, the verdict form asked whether the City had proved the claim against "Open" and whether "Open" had proved waiver or expiration of the statute of limitations. App. vol. 6, at 4–6. The district court instructed the jury to find waiver if:

> 1. The City learned the actual or true facts after it began the project with Open, but before it ceased the project with Open; and
>
> 2. The City continued the project with Open with full knowledge of the actual facts when a reasonable person under the same or similar circumstances would not have done so.

App. vol. 5, at 165. Open objected to the City's request that the instruction specify, "full knowledge of *all* the actual facts," but it did not otherwise object to the waiver instruction. App. vol. 15, at 7 (emphasis added).

The jury determined that the City had proved fraudulent inducement and negligent misrepresentation, but that the City had waived the negligent-misrepresentation claim. The City elected to rescind the contract, so the court

7

dismissed the jury. And because the City elected to rescind the contract, Open's counterclaim for breach of contract disappeared.

Open timely renewed its motion for judgment as a matter of law under Rule 50(b). And as part of its rescission brief, it also moved under Rule 52(c) for partial judgment, arguing (1) that the City's evidence did not support a restitution award and (2) that the City had waived rescission as a remedy.[3] The court denied the Rule 52(c) motion, *City of Fort Collins v. Open Int'l, LLC*, No. 1:21-CV-02063-CNS-SBP, 2024 WL 1239934, at *11–12 (D. Colo. Mar. 21, 2024), and entered judgment against "Open" for just under $20 million. Open again moved for judgment as a matter of law under Rule 50(b) and moved under Rule 52(b) for amended or additional findings and Rules 59(a) and (e) for amendment of the judgment or a new trial. The court orally denied those motions and the earlier Rule 50(b) motion. Open timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.[4]

---

[3] The district court correctly noted that Rule 52 is reserved for nonjury trials, but nonetheless addressed Open's arguments "in the hopes of obviating the need to address the[] matters in the future[.]" *City of Fort Collins v. Open Int'l, LLC*, No. 1:21-CV-02063-CNS-SBP, 2024 WL 1239934, at *2–3 (D. Colo. Mar. 21, 2024).

[4] The district court had diversity jurisdiction under 28 U.S.C. § 1332. Open International and Open Investments are both Florida limited liability companies and their members are all Florida citizens. And Fort Collins is a city in Colorado, so it is a Colorado citizen. *See* App. vol. 3, at 47 ¶¶ 3–5.

## DISCUSSION

Open presents four arguments on appeal: (1) that Colorado's economic-loss rule and the parties' contract bar the City's tort claims; (2) that insufficient evidence supports the jury's finding of fraud; (3) that the City waived its ability to rescind the contract; and (4) that Open Investments cannot be held liable for the rescission award.

## I.    Tort Claims Not Barred

First, Open asserts that the district court erred by denying its motion for judgment as a matter of law, which argued that the City's tort claims were barred by the economic-loss rule and the parties' contract.

"We review de novo a district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court." *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1295 (10th Cir. 2022). In reviewing the denial of such a motion, "we draw all reasonable inferences in favor of the nonmoving party," and we reverse "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the nonmovant." *Id.*

## A.    Colorado's Economic-Loss Rule

"Under the economic loss rule, a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Mid-Century Ins. Co. v. HIVE Constr., Inc.*, 567 P.3d 153, 158 (Colo. 2025) (citation modified). Though it is termed the "economic loss rule," a "more

9

accurate designation . . . would be the 'independent duty rule'" because the "key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 & n.8 (Colo. 2000).

To determine whether a tort duty arises independent of a contract, Colorado courts ask: "(1) whether the relief sought in [tort] is the same as the contractual relief; (2) whether there is a recognized common law duty of care in [tort]; and (3) whether the [tort] duty differs in any way from the contractual duty."[5] *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004). After examining each factor, we conclude that the City's tort claims are not barred by the economic-loss rule.

First, the City is seeking the same relief in tort that it is seeking under the contract. In its complaint, the City sought rescission for both the tort and contract claims, and alternatively sought damages for its contract claim. App.

---

[5] Though the Colorado Supreme Court has never held as much, dicta in Colorado cases suggest that "the economic loss rule generally should not apply to intentional tort claims." *Mid-Century Ins. Co.*, 567 P.3d at 156–57; *see, e.g.*, *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000) ("It is settled in Colorado that the economic loss rule applies only to tort claims based on negligence[.]"); *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1153, 1154 n.6 (Colo. 2019) (observing that previous cases had applied the economic-loss rule "to bar only certain common law negligence claims" and stating that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation"); *Town of Alma*, 10 P.3d at 1263 (citing *Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995), a case that involved a common-law fraud claim, as an example of a common-law tort that is independent of a breach-of-contract claim).

10

vol. 3, at 62 ¶ 79 (rescission for tort claim), 64 ¶ 89 (rescission for contract claim, alternatively damages); *see also id.* at 47 ¶ 2. So this factor supports Open's view that the economic-loss rule bars the City's tort claims. *See Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108, 121 (Colo. App. 2021).

Second, because fraudulent inducement is a common-law tort claim, "there is a recognized common law duty of care in [tort.]" *BRW*, 99 P.3d at 74; *see also Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 607 (Colo. 2016). So this factor supports the City.

Third, and most critically, "the [tort] duty differs . . . from the contractual duty." *BRW*, 99 P.3d at 74. Open claims that the parties' contract "set[s] out precisely the same duty on which the City's fraud claim is based"— "the grades Open assigned to thousands of software functionalities in its response to the City's RFP, and the City's claim that some of the delivered functionalities were inferior to those representations." Op. Br. at 25–26. So because the contract incorporated those grades and provided the requirements for Open's software service, Open concludes that the contract subsumes the City's fraud claim. We disagree.

Torts based on precontractual conduct are often found to be independent of the contract. *In re Bloom*, 622 B.R. 366, 429 (Bankr. D. Colo. 2020) (collecting cases). For example, in *Van Rees v. Unleaded Software, Inc.*, the Colorado Supreme Court found that the plaintiff's allegation that the defendant

11

had "wrongfully induced him into entering a contractual relationship knowing that it did not have the capability to perform any of the promised [services]" established "a violation of a tort duty that is independent of the contract." 373 P.3d at 607. The court explained that "[t]here is an important distinction between failure to perform the contract itself, and promises that induce a party to enter a contract in the first place." *Id.* It said that the "critical question" was not whether the tort claims were "related to the promises that eventually formed the basis of the contract," but "whether the tort claims flow[ed] from an independent duty under tort law." *Id.*; *cf. Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo. 1991) ("[C]laims of negligent misrepresentation are based not on principles of contractual obligation but on principles of duty and reasonable conduct.").

*Van Rees* is on point with our case. There, the parties contracted for web-related services and the development of new websites. 373 P.3d at 605. The contract specified what services were to be provided and when. *Id.* Like our case, the defendant "missed deadlines and failed to deliver the promised services." *Id.* That was the basis for the plaintiff's breach-of-contract claim. *Id.* But during contract negotiations, the defendant allegedly "knew that it lacked sufficient staff to complete the website on time, and did not intend to provide the [full services]," so it induced the plaintiff into a contractual relationship "knowing that it did not have the capability to perform any of the promised web-related services." *Id.* at 606–07. Like our case, the defendant's

12

misrepresentation about its capabilities formed the basis for the tort claim. *Id.* at 607. And that claim was "an independent duty that did not arise from the contracts," so it was "not barred by the economic loss rule." *Id.* at 606–07. The same is true here.[6]

Notwithstanding *Van Rees*, Open asserts that the City's claims are still barred because the contract memorialized all precontractual representations, which means that the contract subsumed any tort duty. *See BRW*, 99 P.3d at 74 ("If we conclude that the duty of care owed by [the defendants] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts[.]"). But none of Open's cited cases involve *precontractual* representations. *See id.* at 75 (distinguishing its facts—a misrepresentation "during performance" of the contract—from cases involving misrepresentations "*prior to the execution of an agreement*" (citation modified)); *Dream Finders*, 506 P.3d at 123 (finding no independent duty

---

[6] Open criticizes *Van Rees*'s distinction between a failure to perform the contract and promises that induce a party to enter a contract. Reply Br. at 15–16. It relies on *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, a Utah Supreme Court decision in which the court rejected the plaintiff's invitation to adopt a blanket rule that fraudulent inducement is "necessarily independent of the contract" and instead held that a fraudulent-inducement claim that "overlaps completely" with a breach-of-contract claim is barred by the economic-loss rule. 435 P.3d 193, 196–97 (Utah 2018). The court criticized the Colorado Supreme Court's reasoning in *Van Rees*, calling its distinction between performance and inducement "illusory" when "the subject matter of the inducing promises [is] later negotiated for and included in the contract." *Id.* at 197. But whatever the merits of the Utah Supreme Court's reasoning, *HealthBanc* is not binding here because the parties' contract is governed by Colorado law, not Utah law. So *Van Rees* still controls.

because the relevant "conduct occurred after the parties entered into the contract"). The closest Open gets is *Smart v. Stropas*, which involved a seller's precontractual nondisclosure of latent defects in the home. No. 24CA0614, 2025 WL 274726, at *2–3 (Colo. App. Jan. 23, 2025) (unpublished). There, though the intermediate-appellate court found that the economic-loss rule barred the home-buyer's fraudulent-nondisclosure claim, the contract provisions *exactly tracked* the alleged tort duty. *Id.* at *3. The parties' contract both (1) required the sellers to disclose any knowledge of methamphetamine being "manufactured, processed, cooked, disposed of, used or stored at the Property" and (2) represented that the sellers had no knowledge of such methamphetamine use. *Id.* at *1. So the tort duty to disclose latent defects (here, the methamphetamine use) did not "differ[] in any way from the contractual duty" to disclose methamphetamine use. *Id.* at *4 (citation modified). "Because the contract explicitly addressed the sellers' obligation to disclose methamphetamine," the tort duty was subsumed by the contract and barred by the economic-loss rule. *Id.* at *3.

The same is not true for our case; the parties' contract warranted only the *quality* of Open International's performance, not the *accuracy* of Open's representations about its capabilities. Though Open claims that the parties' contract "set out precisely the same duty on which the City's fraud claim is based"—to deliver software functionalities consistent with the representations in the contract, Op. Br. at 25—we agree with the City that Open conflates "its

14

ultimate failures to provide and deliver the software functionalities in breach of its contractual obligations" with its "fraudulent representations about its software which induced the City into" the contract, Resp. Br. at 29–30. *See Van Rees*, 373 P.3d at 607 ("There is an important distinction between failure to perform the contract itself, and promises that induce a party to enter into a contract in the first place."); *see also Dream Finders*, 506 P.3d at 120 ("The economic loss rule does not apply to claims arising from a defendant's pre-contractual conduct because, at that time, there was no contract that could have subsumed identical tort duties."). Like the plaintiff in *Van Rees*, the City's "tort claims are based on misrepresentations made prior to the formation of the contracts," which fraudulently induced it to enter the contract "and therefore violated an independent duty in tort to refrain from such conduct." 373 P.3d at 607. So applying *Van Rees*, the third factor supports the City and finding that "the claims are not barred by the economic loss rule." *Id.*

As a final argument, Open claims that the economic-loss rule bars the City's claims because the City is recovering a remedy that is expressly excluded under the contract. *See Dream Finders*, 506 P.3d at 125 ("Sophisticated commercial entities . . . may not circumvent the exclusion of damages in their contracts by cloaking their claims in tort theories."). The contract states that "Open's entire liability" for breaching any of the warranties "will be for Open to correct or reperform any nonconforming [s]ervices[.]" App. vol. 19, at 7 ¶ 2.1. And though the limitations-of-liability provision

15

contemplates damages and limits the type and amount of damages that can be recovered, recovery of damages is limited to (1) indemnification claims, (2) intentional breaches of the confidentiality and personally-identifiable-information provisions, and (3) unauthorized use of Open's intellectual property. *See id.* at 12–13 ¶¶ 12.1–12.2. Yet the City sought rescission and alternatively damages, including attorneys' fees and litigation costs.

But Open doesn't cite any Colorado Supreme Court case that supports that this is a relevant consideration for determining whether a tort duty is independent of a contract. And the cases that Open does cite all involve tort duties that were subsumed by the contract. *See Dream Finders*, 506 P.3d at 123–25 (concluding that the defendant's "duty to not make misrepresentations or engage in fraud after they entered into the contract" was "subsumed within the contract through the implied duty of good faith and fair dealing," and then observing that the claimants sought to recover "the very category of damages" that was barred by the contract); *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1170 (D. Colo. 2018) ("[T]o the extent that Quicken Loans alleges misrepresentations by RE/MAX *that are memorialized in the* [*contract*], the parties allocated risk with respect to those obligations by contract, and tort claims based on those obligations are barred by the economic loss rule." (emphasis added)). So though the City seeks to recover a type of relief that the contract prohibits, the conduct warranting the relief is independent of, and therefore not governed by, the contract.

16

Thus, under Colorado law, the City's tort claims are not barred by the economic-loss rule.

### B.    Merger Clause and Other Provisions

Open also contends that the contract's merger clause and limited-warranty provisions bar the City's tort claims.

Though a merger clause "limit[s] future contractual disputes to issues . . . expressly set forth in the executed document," misrepresentation claims "are based not on principles of contractual obligation but on principles of duty and reasonable conduct." *Keller*, 819 P.2d at 72–73. So the "mere presence of a general integration clause in an agreement does not bar a claim for negligent or fraudulent misrepresentation." *Id.* at 73. Instead, to "effect a waiver of a claim of negligent [or fraudulent] misrepresentation," the merger clause must "specifically prohibit[]" the claim. *Id.*

Open asserts that the contract's merger clause bars the City's tort claims because it "was quite specific with its integration of Open's RFP response into the contract and the parties' disclaimer of extracontractual representations and promises." Op. Br. at 23. But the merger clause says nothing about *precluding claims* for negligent or fraudulent misrepresentation. *See* App. vol. 19, at 19 ¶ 18.15. Though Open is correct that the clause *covers* the SOW and functionality matrix, the inclusion of those documents "does not specifically preclude" a fraud claim. *Keller*, 819 P.2d at 73. So the mere fact of a merger clause "does not effect a waiver of [the tort] claim." *Id.* And unlike *Steak n*

17

*Shake Enterprises, Inc. v. Globex Co., LLC*, in which the court found that a merger clause precluded a fraudulent-inducement claim because it disproved reliance "as a matter of law," 110 F. Supp. 3d 1057, 1083 (D. Colo. 2015), the merger clause here says nothing about reliance. *Compare* App. vol. 19, at 19 ¶ 18.15, *with Steak n Shake*, 110 F. Supp. 3d at 1083 (merger clause stating that the "Franchisees were entering into the agreement as a result of their own investigation and not as a result of any representation by Plaintiffs"); *see also* App. vol. 19, at 6 (contract introduction stating that "the City has proceeded with reasonable reliance on Open's representations"). So the merger clause does not bar the City's tort claim.

Open also asserts that the contract's limited-warranty provisions bar a tort claim because they "expressly disclaim[] reliance on precontractual representations[.]" Op. Br. at 24. Even if that were true (it's not), Open has waived this argument by presenting it for the first time on appeal.[7] *See*

---

[7] Open claims it preserved this argument by "ma[king] a cogent and complete argument . . . discussing the complete and specific integration of the functionality matrix [and the] specific merger clause" in its post-trial and summary judgment motions, and that circuit precedent does not "require a listing of every piece of evidence supporting an argument." Reply Br. at 17–18 (citing *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1256 (10th Cir. 2017)). But Open misreads *Perez*. In *Perez*, we determined that the appellant had preserved its issues on appeal because the "Rule 50(a) motions contained identical *arguments*" as the Rule 50(b) motion. 847 F.3d at 1255–56 (emphasis added). Though the Rule 50(b) motion "did not rely upon the exact same *facts*" as the earlier motions, we noted that such "technical precision [was] unnecessary." *Id.* (emphasis added) (citation modified). But here, Open didn't simply fail to include certain facts—it failed to include the argument itself. In its Rule 50(a)

*(footnote continued)*

*Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1183 (10th Cir. 1999) ("By failing to timely raise the issue to the district court, [the defendant] waived the issue[.]").

Neither the economic-loss rule nor the contract's merger clause bar the City's tort claims, so we affirm the district court's denial of Open's motion for judgment as a matter of law.

## II.    Sufficient Evidence of Fraud

Second, Open asserts that we should reverse the jury's verdict because "the record is devoid of any evidence of an actual and actionable material misrepresentation." Op. Br. at 21 (emphasis omitted).

"When a jury verdict is challenged on appeal, our review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Bangert Bros. Constr. Co., Inc. v. Kiewit W. Co.*, 310 F.3d 1278, 1292 (10th Cir. 2002) (citation modified). "Substantial evidence is something less than the weight of the evidence, and is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id.* (citation modified).

---

and (b) motions, Open argued only that "the economic loss rule and integration clause bar the City's fraud and negligent misrepresentation claims[.]" App. vol. 5, at 126 (Rule 50(a) Motion) (citation modified); *see also* App. vol. 6, at 151 (Rule 50(b) Motion). The motions did not mention the limited-warranty provisions.

"Because the jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact, this standard of review is quite deferential to the jury's verdict." *Knowlton*, 189 F.3d at 1183–84 (citation modified).

At trial, the City alleged three misrepresentations: (1) the projected timing for deliveries, (2) the statement in the RFP response that Version 8 of the software had been released in 2017, and (3) Open's grading of the functionality matrix and its use of a software portal other than its homegrown portal. Because the parties and the district court focus on mainly the third misrepresentation, and because we conclude that there is sufficient evidence supporting that the third misrepresentation was fraudulent, we do not discuss the other alleged misrepresentations.

### A.    The Functionality Matrix

The City contends that "[t]he most striking example of Open's false representation was its fraudulent grading of its software in response to the City's RFP in March 2018." Resp. Br. at 15. In Open's RFP response, Open graded 89.7% of the required functionalities as "A," or as already existing in the current software system. But trial evidence showed that Open had internally graded only 59.4% of its functionalities as the equivalent of an "A." And because the internal grading was never disclosed to the City, the City claims that Open's RFP response fraudulently represented its functionalities.

20

Open claims that it accurately graded its functionalities based on the RFP's requirements. Below are the RFP's requirements for an "A" and "B" grade:



**Proposed Vendor Functional Matrix Responses**

| | | |
|---|---|---|
| A | Provided as part of base system. | No Modification is required. Desired functionality is achieved through configuration and is part of base Code. Cost of configuration is part of solution implementation. |
| B | In Development | Not Currently in the system, but will be fully vetted, tested and present in the system prior to launch. Enhancement or modification to enable this functionality will be included in price. |

App. vol. 2, at 3. Open asserts (1) that "unrefuted trial testimony" showed that Open's grading was consistent with the RFP's instructions and (2) that its internal assessment cannot sustain the City's fraud claim because it "sorted the functionalities using different criteria [than the functional matrix] for a different type of internal analysis." Op. Br. at 39.

At trial, Open International's president explained that Open's grading was consistent with the RFP's instructions because the instructions asked about functionalities in Open International's base code, not functionalities in a released version of the software. App. vol. 12, at 184–85, 189–95. And because an "A" grade meant that the "[d]esired functionality is achieved through configuration," even an "A" grade required some level of additional work. App. vol. 2, at 3; App. vol. 12, at 192–93; *see also* App. vol. 11, at 42 (the City's third-party consultant testifying that "configuration" involves "five-plus

21

things"). Open claims that the City's expert witness corroborated this testimony by agreeing that Open could grade a functionality as an "A" if that functionality was present in an earlier version of the software (but not the unreleased Version 8) so long as Open stated that the functionality was in an earlier version. *See* App. vol. 11, at 133–34. So Open concludes that the representations were true and cannot support a finding of fraud.

Open also contends that its internal assessment "sorted the functionalities using different criteria [than the functional matrix] for a different type of internal analysis." Op. Br. at 39. Below is a summary table of Open's internal assessment:

**Overall fulfillment: 96.6%**

|  | % | Total % |
|---|---|---|
| Current functionalities | 59.4 % | 59.4 % |
| Planned for 2018 | 24.9% | 84.3 % |
| Future developments | 6.1% | 94.4 % |
| Person P&T | 0.5% | 94.9 % |
| Person SP/Integration/Configuration | 5.7% | 96.6 % |

App. vol. 22, at 16. At trial, the City argued that the internal assessment showed that only 59.4% of the functionalities (the "[c]urrent functionalities" category) should have been given an "A" grade. But Open contends that its internal assessment "merely broke down the RFP's 'A' grade into two subcategories": "[c]urrent functionalities" and "[p]lanned for 2018." Reply Br. at 10. Open International's president testified that both categories had the required existing base code, but that the functionalities in the "[c]urrent

22

functionalities" category were already integrated into Version 8 while the functionalities in the "[p]lanned for 2018" category would be integrated later in 2018. App. vol. 12, at 191; *see also id.* at 194–95 (testifying that three of the five categories corresponded with an "A" grade, one of the categories corresponded with a "B" grade, and one of the categories corresponded with multiple grades). Open acknowledges that the City "tried to impeach" its witness on this subject but claims that "nothing contradicted his testimony." Op. Br. at 40.

But Open's testimony was not unrefuted. On cross-examination, the City showed the president's lack of knowledge about the internal document. *See* App. vol. 13, at 29, 31. The president's deposition testimony differed from his trial testimony, and the district court instructed the jury on inconsistent statements after the jury asked for guidance. *See id.* at 261 ("I heard a lot of in-person testimony today that was inconsistent with recorded deposition. What are your instructions for us, the jury, how to deal with that?"). It was the jury's role to "give [the testimony] such credibility as [it] may think it deserves." App. vol. 14, at 5. Also, the City presented evidence that "[i]ndustry standard is to provide factual and accurate responses of [the vendor's] product or solution . . . at *the time of response*." App. vol. 11, at 84 (emphasis added). So we agree with the district court that there was a "dispute about what is A [grade] versus what [is] B [grade]" and that it was "completely a jury decision to conclude whether [Open] was making those representations as to a current fact or a fact

23

in effect at the time the product went live[.]" Resp't Add. at 13. The jury made its decision and "[w]e do not retry issues, second guess the jury's decision-making, or assess the credibility of witnesses and determine the weight to be given their testimony." *Stroup v. United Airlines Inc.*, 26 F.4th 1147, 1157 (10th Cir. 2022) (citation modified).

Open also asserts that the grades given to the various functionalities in the functionality matrix are not actionable misrepresentations because the parties' contract stated that the criteria for the matrix and RFP response were "open to interpretation" and fraud claims cannot "rest on articulations of opinion or belief." Op. Br. at 38, 41. But Open did not present this argument in the district court. *See* App. vol. 5, at 122–24 (Rule 50(a) Motion) (asserting that the City had not proven a misrepresentation because "the functional matrix instructions required those functionalities to be delivered at go-live," not at the time Open submitted its RFP response); App. vol. 6, at 147–48 (Rule 50(b) Motion) ("Nothing in the RFP requested a vendor to grade its then-existing software[.]"). So it is waived. *See Knowlton*, 189 F.3d at 1183.

Given the conflicting testimony about Open's internal assessment and its RFP response, the jury had sufficient evidence to find that Open fraudulently represented its functionalities.

**B.    Grading a Different Portal**

The City also asserts that the jury could have found fraudulent inducement because of *what* Open graded. Despite allegedly knowing on March

24

1, 2018, that it planned to stop developing its homegrown portal and instead use the Milestone portal, Open still graded its homegrown portal for the RFP response. Open argues that this cannot support a fraud claim because the City admitted at trial that it knew before signing the contract that Open International planned to use the Milestone portal and because the City had described an early demonstration of the portal as being "exactly as expected when we selected Open Smartflex." App. vol. 18, at 177; *see also* App. vol. 9, at 88–89; App. vol. 12, at 196–97. Though the City knew that Open International was using the Milestone portal for the contract, Open International's president agreed at trial that "[n]o one at Open told the City [that Open] did not grade the Milestone portal in the RFP response[.]" App. vol. 13, at 254–55. Again, because there was conflicting testimony on this issue, we defer to the jury's finding. *See Knowlton*, 189 F.3d at 1183–84 ("[T]he jury has the exclusive function of . . . resolving conflicts in the evidence, and reaching ultimate conclusions of fact[.]" (citation modified)). So we affirm the jury's verdict finding Open liable for fraudulent inducement.

## III.    Ability to Rescind

Third, Open asserts that because the City knew of multiple problems with the software and its implementation by spring 2020, yet continued to affirm the contract, the City waived its right to rescind the contract.

"A party must rescind a contract within a reasonable time, but what constitutes a reasonable time depends upon the facts of a particular case and

must be determined by the trier of fact." *Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334, 340 (Colo. App. 1985). We review "findings of fact for clear error." *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 826 (10th Cir. 1993). A "finding of fact is not clearly erroneous unless it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Mile High Indus. v. Cohen*, 222 F.3d 845, 854 (10th Cir. 2000) (citation modified).

## A.    The Waiver Rule

The district court instructed the jury to find that Open proved "the affirmative defense of waiver" if the City "continued the project with Open with full knowledge of the actual facts when a reasonable person under the same or similar circumstances would not have done so." App. vol. 5, at 166. That instruction is based on *Elk River Associates v. Huskin*, in which a Colorado appellate court explained that "[t]o sustain the defense of ratification and waiver, it must appear that the defrauded party, with full knowledge of the truth respecting the false representations, elected to continue to carry out the agreement." 691 P.2d 1148, 1153 (Colo. App. 1984).

But Open contends that "the 'full knowledge' requirement comes into play only if one elects to affirm the agreement and thereafter continues to carry it out and receive its benefits, which would then result in a remedy of damages, not rescission." Op. Br. at 36 (citation modified). Open asserts that to waive *rescission*, "[i]t is not requisite that the defrauded party shall be acquainted

26

with all the evidence constituting the fraud[.]" *Id.* at 35 (quoting *Gladden v. Guyer*, 426 P.2d 953, 955 (Colo. 1967)). Instead, rescission is waived once a party "has evidence sufficient to reasonably actuate him to rescind the contract[.]" *Id.* (quoting *Gladden*, 426 P.2d at 955). So Open concludes that the jury decided only whether the City had waived its ability to recover damages for Open's fraud, not whether the City had waived its ability to rescind the contract.[8]

We disagree. As the district court correctly stated, "Colorado courts do not treat fraudulent inducement waiver and recission waiver as separate claims, governed by different tests[.]" *Open Int'l, LLC*, 2024 WL 1239934, at *4; *accord Gerbaz v. Hulsey*, 288 P.2d 357, 363 (Colo. 1955) ("If [it] was actually the fact [that the plaintiff misrepresented the contract] then defendant was in a position to elect, when he discovered the fact, *either* to rescind the contract, or to sue for damages[.]" (emphasis added)); *Bankers Tr. Co. v. Int'l Tr. Co.*, 113 P.2d 656, 664 (Colo. 1941) ("[T]he right to rescind and sue [is] waived" if "the defrauded party, with full knowledge, intentionally condoned the fraud, affirmed the contract and abandoned all right to recover damages."). A party waives the right to rescind when it has full knowledge of *the material fact of*

---

[8] Open's argument in the district court was a little different. Rather than separating the waiver rules based on two types of remedies (damages and rescission), it separated the waiver rules based on whether the plaintiff was pursuing a *claim* or seeking a *remedy*. *See Open Int'l, LLC*, 2024 WL 1239934, at *3.

27

*the fraud*, even if it does not know all the underlying details of the fraud. *See Tisdel v. Cent. Sav. Bank & Tr. Co.*, 6 P.2d 912, 917 (Colo. 1931) (finding waiver because the defendant had "full knowledge *of the falsity* of the representations, and [] all the *material facts* respecting the same well in mind" (emphasis added)); *Gladden*, 426 P.2d at 955 ("The duty of rescinding arises immediately upon acquiring knowledge of the substantial and *material facts* constituting the fraud" and "no subsequent discovery of cumulative evidence can operate to execute waiver of the fraud if one has in the meantime occurred, or to revise a once lost right of rescission." (emphasis added) (citation modified)); *see also In re Mascio*, 454 B.R. 146, 151 (Bankr. D. Colo. 2011) (defining "full knowledge" as "the substantial and *material facts* constituting the fraud" (emphasis added) (quoting *Gladden*, 426 P.2d at 955)). So a party need not elect rescission until "he becomes aware of facts or circumstances that entitle him to a rescission." *Young v. Leech*, 240 P. 692, 693 (Colo. 1925); *see Gerbaz*, 288 P.2d at 363 ("[T]he[] defendant was in a position to elect[] *when he discovered the fact*[.]" (emphasis added)).

Open claims that it makes sense to have separate waiver rules for rescission and claims for damages because it "prevent[s] a party from waiting to see how their contract plays out before deciding whether to rescind or sue for damages." Reply Br. at 19–20. But Open never explains why "waiting to see how the[] contract plays out" before suing for damages should be treated differently than "waiting to see how the[] contract plays out" before rescinding.

28

*Id.* Indeed, the point of waiver is to prevent the "waiting to see how the[] contract plays out" part. *See Stoner v. Marshall*, 358 P.2d 1021, 1023 (Colo. 1961) ("[The] election [of rescission or damages] must be promptly made . . . otherwise one might, with knowledge of fraud, speculate upon the advantages or disadvantages of an agreement, receive its benefits, and thereafter repudiate all its obligations." (citation modified)). Though Open is correct that many cases the City and the district court cite involve claims for damages instead of rescission, it has not persuasively explained why that matters. Regardless of the remedy, the question is whether the party waived its right to recovery by acting like everything was okay under the contract and then turning around and seeking recovery for the very conduct it chose to ignore.

So the district court properly instructed the jury on waiver, and we now consider whether the finding that the City did not waive its right to rescind the contract was clearly erroneous.

### B.　No Waiver

The jury found that the City did not waive its right to recover for Open's fraudulent inducement. And the district court accepted that factual finding. *See Open Int'l, LLC*, 2024 WL 1239934, at *3–4. Because this finding has factual support in the record, it was not clearly erroneous. *See Cohen*, 222 F.3d at 854; *cf. Ralston Oil & Gas Co.*, 719 P.2d at 340 (holding that the trial court's conclusion "that plaintiff did not unreasonably delay seeking rescission of the contract" was "amply supported by the record").

Open contends that the City knew these facts by spring 2020: (1) that the software was untested and had not been installed for any other customer, (2) that the customer portal was not satisfactory and was not the portal represented during the vendor-selection process, (3) that the software's functionalities were only 58% of the required functionalities, and (4) that there were significant issues with Open International's product. And Open asserts that despite this knowledge, the City agreed to PCR 19, which was meant to address the issues with the software and deliver complete functionality, and thus affirmed the contract and waived rescission.

But Open continues to conflate the problems with its software with its fraudulent precontractual representations; knowledge of these problems is not the same as knowledge of fraud. Though the jury could have inferred knowledge of fraud based on knowledge of the above facts, it was not required to do so. The City's CFO testified that realizing Open's misrepresentations "was a gradual process" and that the "functional matrix work was the point in time where [the CFO] said I think we may have gotten swindled." App. vol. 7, at 108. And there was evidence that the City did not learn of Open's internal assessment of the functionality matrix until discovery. *See* App. vol. 13, at 254–55. So there was at least conflicting evidence about when the City discovered the fraud.

Open criticizes the City's CFO's testimony as "conclusory, self-serving, and self-contradictory[.]" Reply Br. at 21. But it was the jury's role to assess

30

the witnesses' credibility and weigh the evidence. *See Bankers Trust Co.*, 113 P.2d at 664 ("[Q]uestions as to the time when plaintiff first discovered the fraud . . . are questions of fact for resolution by a jury."); *Ralston Oil & Gas Co.*, 719 P.2d at 340 ("A party must rescind a contract within a reasonable time, but what constitutes a reasonable time depends upon the facts of a particular case and must be determined by the trier of fact."). And "[w]e do not retry issues, second guess the [factfinder]'s decision making, or assess the credibility of witnesses and determine the weight to be given their testimony." *Stroup*, 26 F.4th at 1157 (citation modified)).

Because the court's (and the jury's) finding that the City did not waive its right to recover had support in the record, the finding is not clearly erroneous, and we affirm the rescission.

## IV.   Open Investments' Liability

Finally, Open challenges the district court's denial of its Rule 50(b) motion that argued that Open Investments could not be liable for rescission (a tort remedy) because it was only a guarantor of the contract and thus liable only for contract damages. Alternatively, it argued that even if Open Investments could be liable for rescission, there was insufficient evidence that Open Investments made a fraudulent or negligent misrepresentation.[9] But we agree

---

[9] Open complains that the City "eschewed" its burden to prove each defendant's liability "by sleight-of-hand, using 'Open' as a trial shorthand to refer to both defendants collectively." Op. Br. at 42. But in the district court,

(*footnote continued*)

with the district court that Open has long waived this argument. *See Open Int'l, LLC*, 2024 WL 1239934, at \*5 ("[T]his argument disclaiming any liability of Open Investments comes far too late.").

Open argued for the first time in its Rule 50(b) motion, one month after the jury had been dismissed, that Open Investments could not be held liable for the rescission remedy. *See* App. vol. 17, at 176 (Q: "Prior to your Rule 50[b] motion, had this issue ever been brought up?" A: "Your Honor, I don't think it was brought up until the election of remedies[.]"). Because Open failed to make this argument in its Rule 50(a) motion, and because the City objected to this new argument, the issue is waived and we will not consider it on appeal.[10] *See*

---

*all* parties consistently referred to Open International and Open Investments collectively as "Open" or "Defendants." *See e.g.*, Supp. App. vol. 1, at 50–85 (Open's Partial Motion for Summ. J.); App. vol. 2, at 184–224 (Final Pretrial Order); App. vol. 4, at 1–2 (Open's Motion to Compel Election of Remedies); App. vol. 5, at 118–40 (Open's Rule 50(a) Motion); App. vol. 7, at 25 (Open's Opening Statement) ("Now, who is Open? Open is not just one company, as the judge mentioned."). And Open never objected to the jury instructions or to the verdict form that referred to "Open" collectively.

[10] Open asserts three reasons why its argument would not be waived. First, it repeats its earlier argument that "technical precision [between Rule 50(a) and Rule 50(b) motions] is unnecessary[.]" Op. Br. at 43 (quoting *Perez*, 847 F.3d at 1256). We reject that argument for the same reason we rejected it above—Open failed to make the *argument* in its motion. *See Perez*, 847 F.3d at 1255–56. Second, Open claims that its argument is not waived under Federal Rule of Civil Procedure 46, which provides that "[f]ailing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made." Fed. R. Civ. P. 46. But Open doesn't assert that it had *no opportunity* to object; it asserts that "there was *no reason* for Open Investments to object[.]" Op. Br. at 47 (emphasis added). So Rule 46 does not save Open's argument. Third, Open contends that Federal Rule of Civil Procedure 52(a)(5) preserves

(*footnote continued*)

32

*Therrien v. Target Corp.*, 617 F.3d 1242, 1250 n.2 (10th Cir. 2010) ("Ordinarily a party cannot raise in a Rule 50(b) motion an argument not already raised in its Rule 50(a) motion. But on appeal we can consider such an argument when the opposing party failed to object to the Rule 50(b) motion for raising new arguments." (citation modified)). So we affirm the district court's denial of Open's Rule 50(b) motion on this issue.

## CONCLUSION

We affirm the jury's verdict and the district court's denial of Open's motions for judgment as a matter of law.

---

its claim. But Rule 52(a)(5)'s directive that "[a] party may later question the sufficiency of the evidence supporting the [court's] findings, whether or not the party . . . objected to them" is reserved for nonjury trials. *See* Fed. R. Civ. P. 52(a)(1) ("***In General.*** In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."); *see also Johnson v. Raemisch*, 779 F. App'x 507, 518 n.10 (10th Cir. 2019) ("Rule 52 governs bench trials[.]"). Though the restitution *amount* was decided by the court, the issue Open challenges here—its liability—was tried before a jury. *See Open Int'l, LLC*, 2024 WL 1239934, at *1–2. So Rule 52 offers Open no help either. Open waived its argument.